United States District Court
Middle District of Florida
Jacksonville Division

**UNITED STATES OF AMERICA,**

 *Plaintiff,*

v.                   NO. 3:15-cr-185-J-34PDB

**SHELDON LAMONT JACKSON,**

 *Defendant.*

___

## Report and Recommendation on Defendant's Motion to Suppress

A police officer pulled Jackson over for a traffic violation. Jackson gave the officer consent to search his car. The officer found a loaded pistol under the driver's seat. Jackson is charged with possessing the pistol after having been convicted of a felony. Doc. 1. He moves to suppress evidence of the pistol, contending his consent was not voluntary. Docs. 28 (motion), 41 (supplement).[1] The United States opposes suppression. Docs. 37 (response to motion), 43 (response to supplement).

I conducted an evidentiary hearing. Docs. 38 (minutes), 42 (transcript). The United States presented testimony of three officers with the Jacksonville Sheriff's Office: Sergeant David Ferricane, Officer Billy Reinert, and Reserve Officer John Ritchie. Doc. 38. The United States presented four exhibits admitted without objection: aerial photographs of the location of the traffic stop (government exhibits 1 and 2), a computerized spreadsheet showing when, where, by whom, and for what purpose officer calls were made on the evening of the traffic stop (government exhibit

___

[1]Jackson originally argued suppression of the pistol was warranted for additional reasons (the traffic stop was illegal at its inception and lasted too long). Doc. 28. He has withdrawn those arguments. Doc. 41 at 1.

3), and a "consent to search" form signed by Jackson (government exhibit 4). Jackson presented testimony of Tawama Thompson. Doc. 38.

## Evidence

Except as indicated, the facts are undisputed.

On January 25, 2015, Sergeant Ferricane—a seven-year officer—was on patrol duty at an apartment complex in the Arlington area.[2] Doc. 42 at 5, 7–10, 50, 61; Gov't Ex. 1–2. The area is known for drugs and violent crimes. Doc. 42 at 25, 51. The complex manager had requested more policing because of recurring crime. *Id.* at 7. Sergeant Ferricane was in uniform in a marked car. *Id.* at 7, 15. He was alone, and it was dark. *Id.* at 25. The car had no recording device. *Id.* at 21.

At 8:19 p.m., Sergeant Ferricane saw Jackson driving outside the complex on the wrong side of University Club Boulevard and pulled him over. *Id.* at 11–12, 18–21, 36, 72–73; Gov't Exs. 1–3. Two people were with Jackson—Allie Wright (his girlfriend) was in the front passenger's seat, and Thompson (his friend) was in the back passenger's seat. Doc. 42 at 16, 22, 37, 68–70, 73–74.

Thompson lives in the apartment complex. *Id.* at 68, 70. She has known Jackson for five or six years, he is like her "big brother," he is always there for her, and she thinks he is a "good guy." *Id.* at 85. Jackson was giving her a ride home from a cookout because she did not want to ride the bus. *Id.* at 70, 85–87. She had been drinking. *Id.* at 83–87.

At some point during the traffic stop, the car occupants asked why they had been stopped, with Thompson "in the back doing most of the talking." *Id.* at 74. Sergeant Ferricane explained why. *Id.* at 21, 73–77. Jackson explained he had been

---

[2]Sergeant Ferricane was an officer at the time of the traffic stop. Doc. 42 at 6. He later was promoted to sergeant. *Id.*

2

driving on the wrong side of the road because he had backed up into the road upon confronting a closed gate to the apartment complex. *Id.* at 21, 36−37. The explanation made sense. *Id.* at 36.

At some point during the traffic stop, Jackson handed Sergeant Ferricane a paper copy of his driver's license. *Id.* at 22. Knowing a driver who possesses only a paper copy of his license probably has a suspended license confiscated by law, Sergeant Ferricane asked him if his license was suspended. *Id.* at 22, 39, 75. He said yes. *Id.* at 23, 39. Sergeant Ferricane asked him if there was any contraband in the car. *Id.* at 24, 42. He said no. *Id.* Sergeant Ferricane called for backup. *Id.* at 24, 41−42, 48–49. Sergeant Ferricane asked him if he could search the car. *Id.* at 24, 41. Sergeant Ferricane did not threaten to arrest him. *Id.* at 34−35. Jackson consented. *Id.* at 25.

Officer Reinert and Reserve Officer Ritchie arrived eight or nine minutes later. *Id.* at 26−27, 61−62; Gov't Ex. 3. Sergeant Ferricane told them he had obtained consent to search the car and asked for their help. Doc. 42 at 51. The officers got Jackson, Thompson, and Wright out of the car individually to make sure none had a weapon. *Id.* at 27, 52, 64.

Sergeant Ferricane reviewed a standard consent-to-search form with Jackson and asked him to sign it. *Id.* at 27−28. The form provides:

> I, Sheldon Jackson do hereby authorize law enforcement officers to conduct a complete search of my person and/or the premises located at 5501 University Club Blvd. N. and/or the motor vehicle, 2006 Kia Optima … license number: 368TNV now located at 5501 University Club Blvd. N. I further authorize said law enforcement officers to open and search any bag, purse or handbag, glove compartment, console, storage compartments, vehicle trunk, or any other contents or container found in or on said person, premises, or motor vehicle. [Law Enforcement officers may collect contraband or evidence of a crime found therein. I have been advised that this search is being conducted in connection with a criminal investigation]. I have not been promised any reward of any type and have not been threatened in any manner. I am giving this

3

> consent voluntarily with the knowledge that any evidence found may be used against me in criminal proceedings, and I have the right to refuse to give this consent.

*Id.* at 29; Gov't Ex. 4. Jackson and Sergeant Ferricane signed the form. Doc. 42 at 28; Gov't Ex. 4.

Officer Reinert and Reserve Officer Ritchie searched the car. Doc. 42 at 29–30, 51–52. A cup of urine was on the front passenger's seat floorboard.[3] *Id.* at 30, 65. A loaded pistol was under the driver's seat. *Id.* at 30, 52–53, 65.

At some point during the traffic stop, Sergeant Ferricane confirmed Jackson's license was suspended. *Id.* at 23, 33, 39, 44–46. Sergeant Ferricane arrested Jackson for driving with a suspended license and "other things" not specified in the record.[4] *Id.* at 43–44. At all times, Sergeant Ferricane was professional and not rude, and no officer drew his weapon or raised his voice. *Id.* at 34, 66, 106. Thompson and Wright were "highly upset with the whole situation." *Id.* at 79.

Sergeant Ferricane's and Thompson's testimony was inconsistent on when he had returned to the patrol car to run background checks. He testified he had done so after Officer Reinert and Reserve Officer Ritchie arrived and before he issued the citation. *Id.* at 33, 45–46. She testified he had done so at the outset of the traffic stop. *Id.* at 74–78.

---

[3] Officer Reinert testified the cup of urine had been "sitting outside the door." Doc. 42 at 53. The cup presumably had been moved from inside the car to outside the car at some point during the traffic stop.

[4] Driving with a suspended license knowing it has been suspended is a second-degree misdemeanor under Florida law. Doc. 42 at 23, 40; *see* Fla. Stat. § 322.34(2)(a). Driving with a suspended license without knowing it has been suspended is a non-criminal infraction under Florida law. Fla. Stat. §§ 322.34(1), 318.12, 318.13(3). For a misdemeanor, an officer may arrest the driver or give him a notice to appear. Doc. 42 at 23, 40–41; *see* Fla. Stat. § 901.15.

4

Sergeant Ferricane's and Thompson's testimony was inconsistent on when he had explained why he was pulling Jackson over. He testified he had done so at the outset of the traffic stop. *Id.* at 21. She testified he had done so after he obtained identifications, ran background checks, and talked to Jackson about his license. *Id.* at 73–77.

Sergeant Ferricane's and Thompson's testimony was inconsistent on reactions to the consent request. He testified Jackson had responded, "[S]ure. Go ahead. There's no contraband. There's no reason any contraband would be in the vehicle." *Id.* at 25, 43. He testified Jackson had been "very agreeable" and had had "no problem" with a search. *Id.* at 25, 43. He testified Jackson had not hesitated, he had not had to talk Jackson into consenting, and Jackson had not appeared intimidated or afraid. *Id.* at 34. In response to defense counsel's question, "And when you asked Mr. Jackson if it was okay if you search the vehicle, isn't it a fact that the two ladies that were in the vehicle put up a fuss about you searching the vehicle," he testified, "No. No one put up a fuss." *Id.* at 42−43. In response to defense counsel's follow-up question, "So neither one of those ladies questioned your authority to search the vehicle or ask you why you were searching the vehicle," he testified, "That is correct. No one interjected any objections." *Id.* at 43.

Thompson testified when Sergeant Ferricane had requested consent, Jackson "at first … was going to go—just go ahead and say yes. But then me and his girlfriend was protesting and kind of made him start protesting."[5] *Id.* at 77−78. She continued:

A   She was like: Search the car?

I was like: Search the car? What's going on?

---

[5]To avoid a self-incrimination issue at the suppression hearing, the parties stipulated to the truth of Thompson's grand jury testimony that she had possessed a small amount of marijuana on her person and had been concerned it would be found on her if she was searched. Doc. 42 at 83−84.

5

> Then that's when she start sounding like: Why would you want to search the car?
>
> So both of us, you know, kind of aggressive about not searching the car, that made—I think that made [Jackson] a little aggressive. …
>
> He was kind of like: Well, you got to have a—I can't recall who it was, but I know it was one of us in there was like: You need to have some type of warrant to search the car.
>
> Then I was like: Why you want to search the car?
>
> And then that's when he start telling us because of the probable cause because everybody in the car had some type of crime—I mean, record of narcotics.
>
> So that made it seem probable cause for him to have all the red flags or some kind of flags, he said, that went up and make him have to search the car.

*Id.* Later asked if Jackson had declined consent, she responded,

> A    He didn't, per se, say just straight up no. It was never a straight no. He just wanted to understand—basically he was saying no, but not saying no, because, like, he wanted to know why.
>
> So that's basically—he didn't say: No, you can't search the car. It was basically: Well, why do you need to search the car? So he never did directly [say] no. …
>
> He never—as far as I recall, he didn't say anything. It was me and his girlfriend the one was basically was agitated and were wanting to know.
>
> So he really was kind of quiet the whole time. You know how most men usually quiet, and most women, 90 percent, we always ya, ya, ya, ya? That was us.
>
> He was kind of like laid back, okay, and let us, you know, get it out. So it was basically us, me and his girlfriend.

*Id.* at 79−80.

On whether Sergeant Ferricane had ever told Jackson there was an "easy way" or "hard way," Sergeant Ferricane's and Thompson's testimony was not inconsistent; they were just asked different questions. He engaged in the following colloquy with the prosecutor:

> Q    Did you threaten to call in a canine unit and more officers to the scene?
>
> A    I don't recall. I don't recall that, no. I don't recall saying that.
>
> Q    Well, you're saying you don't recall. Is that something you would remember, making a threat like that?
>
> A    Yeah. I mean, no, I did not threaten—threaten him in that way, no.
>
> Q    Okay. Well, sometimes people say they don't recall, and they mean it didn't happen, or sometimes they just mean that this happened a few months ago, I don't recall.
>
> A    Right.
>
> Q    Did you threaten to call in more officers and a canine?
>
> A    No.

*Id.* at 35.

Thompson engaged in the following colloquy with defense counsel:

> Q    Did the officer say what would happen if—if a search was not allowed?
>
> A    Yes, sir. He did. He said that if he—he said he could do it two ways. He could either make it nice and easy, go ahead search the car and search us. And if he don't find anything, besides the fact with [Jackson's] license, he had—couldn't drive it back. He couldn't do the driving. We would have to walk. Or me or either the girlfriend, whoever had a license, could get behind the wheel.
>
>     But he said either that, and then he'll let us go on our way.

7

> He said: But we can do it the hard way. He can call for more officers, and then they can tow the car to the police place, and then they can get a warrant, and the car be there until they get a warrant, and then search the car.
>
> And that's when—we was—me and the girlfriend, we was still like just going at it. We not understanding why we going through all of this, just because he made a little backup to get in my apartment. I didn't understand it.
>
> And so we were so busy our rights [sic] and just—we was really upset, me and the girlfriend.
>
> And [Jackson] finally got tired. He was like: Everybody just calm down. Just search the car. I'm tired of it. And then his manhood finally popped in and he just told us to basically shut up and let the officer do his job.

*Id.* at 80−81. Referencing that response on cross examination, the prosecutor asked, "Okay. You testified today that one of the officers said—and I'm just summing up here—we can do this the easy way or the hard way?" *Id.* at 100. She responded, "Right." *Id.* The prosecutor asked, "And that easy way was to permit a search and that hard way would be to call more officers; is that right?" *Id.* She responded, "Right, right." *Id.* The following colloquy between the prosecutor and her ensued:

> Q   It's your testimony that that came from the officer; is that right?
>
> A   Yes. ...
>
> Q   Did you testify before the grand jury that it was [Jackson's] idea to have more officers and a dog come before he would agree to a search?
>
> ...
>
> A   I don't recall that. That's why I said I don't recall that.
>
> Q   Okay. Well, let's look at page 36, line 15.
>
> Do you see where it says: ... Was it [Jackson's] idea to wait for people to come or was it the police for dogs to show up?

8

>   And your response was: No, it was his idea.
>
>   Do you see that?
>
> A   Was it [Jackson's] idea to wait for people to come or was it police for dog to show up?
>
> Q   Do you see that?
>
> A   See, that's why he said it. Because the police officer had asked him did he want it. Did he want it? Did he want—did he want the—was it okay—he said that was it okay for him to send—or was it [Jackson] who said it?
>
>   I think it was the police officer that asked him did he want more people to come. Or I'm not sure was it [Jackson] or the police. It might have been the police have said that.
>
>   I'm not sure did [Jackson] said it or was it the police said it.
>
>   You said [Jackson] idea for more people to come up?
>
> Q   Right.
>
> A   I'm trying to figure out who said it first.
>
>   Well, if it's in the paper [the grand jury transcript]—I'm just trying to remember all this stuff, man.
>
>   If it's in the paper [grand jury transcript]. I don't know why would [Jackson] want to say for the police.
>
> Q   Well, do you remember testifying that it seemed like Mr. Jackson was stalling for time?
>
> A   No, I don't remember that. …
>
> Q   But as you sit here today, you're not sure whose idea it was to bring more officers and a dog before Mr. Jackson would consent to a search. You're not sure whether that was something the officer raised or something that Mr. Jackson raised. You're just not sure?
>
> A   Well, if I'm not mistaken, I think it was the police officer asked him did he want any more people to come. …

9

Q     When defense counsel was asking you questions earlier today, you said that—you testified that it was the police who said: We can do this the easy way or do it the hard way and bring in more officers and a dog; correct?

A     Yeah, that's what he said. So there you go right there.

Q     And then a few minutes ago, you testified that you weren't sure whose idea it was to bring more officers and a dog.

That's what you said; right?

A     Yep, that's what he said. There it is right there. He did say that. He said it was either the hard way or easy way or either he could bring more police officers and a dog. There it is. …

Q     Line 15, the question was asked of you: Was it [Jackson's] idea to wait for people to come or was the police for the dogs to show up?

Do you remember being asked that? Do you see that in the transcript?

A     Uh-huh.

Q     And your response was: No, it was his idea.

And then the question was: His who?

And your response was: Yeah, he said send more people—he said before you—it was his idea to hold up the process of searching the car.

Do you see that?

A     Yeah, yeah. Okay, okay, okay.

Q     And then the next question was: It was [Jackson's] idea?

And your answer was: Yeah.

Do you see that in the transcript?

A     Yeah, yeah.

Now I remember. The police—[Jackson] said that it was okay for him to search the car.

10

>    But the police officer said he had—he could search it with him. That's when he had already said he could search it with him or he could have more people around for him to search it.
>
>    And [Jackson] said: No. I want more people—send more people to come while you search the car.
>
> Q    Okay. So he was okay with searching the car as long as there were more people there?
>
> A    Yeah. He wanted some more people there as witnesses to search the car.

*Id.* at 100−06.

## Motion & Response

Jackson concedes that "if the Court credits Officer Ferricane's testimony and determines that Jackson allowed the search without hesitation, the matter is settled," but contends that "if the Court finds that Ms. Thompson's version of the event is more credible, more analysis is required." Doc. 41 at 2. He argues that, under her version of what happened, because there was no legal basis to believe evidence of a crime would be found in Jackson's car and thus no legal basis to obtain a warrant to search it or detain him to await a K-9 unit, the circumstances differ from cases holding the "the easy way or the hard way" tactic is not per se coercive. *Id.* at 3. He argues factors pertinent to whether his consent was voluntary favor him: he was not free to leave; Sergeant Ferricane held the paper copy of his driver's license and discussed its suspension with him; Sergeant Ferricane made him think a search would occur regardless of consent; he provided consent only after Sergeant Ferricane had employed the "the easy way or the hard way" tactic; and there is no evidence Sergeant Ferricane informed him he could refuse to provide consent. *Id.* at 4−5.

The United States responds the Court should credit Sergeant Ferricane's testimony over Thompson's because hers was "spotty and internally inconsistent," and, even if the Court does not, what she says happened does not amount to coercion

11

sufficient to render Jackson's consent involuntary, particularly given the form he signed stating he had not been "threatened in any manner." Doc. 43 at 1–14. The United States contends cases holding "the easy way or the hard way" tactic is not per se coercive do not hinge on inevitability of a lawful search regardless of consent. *Id.* at 8–9. The United States argues factors pertinent to whether Jackson's consent was voluntary favor the United States: he was not under arrest; he provided both verbal and written consent; he never refused to provide consent; the form he signed informed him he had "the right to refuse to give this consent"; he was cooperative (he had pulled over, explained why he was in the wrong lane, provided his license upon request, and confirmed his license was suspended); and Sergeant Ferricane acted professionally. *Id.* at 10–13.

### Findings of Fact

I propose finding the undisputed facts above. For the disputed facts—when Sergeant Ferricane returned to the patrol car to run background checks, when he explained why he was pulling Jackson over, and the initial reactions to the consent request—I propose crediting Sergeant Ferricane's testimony over Thompson's testimony.

Reflected in faltering and inconsistent testimony, Thompson seemed to struggle with reconciling her seeming genuine desire to abide by her oath to tell the truth; an admittedly hazy memory about what had happened more than a year-and-a-half before her testimony while her mind was less than clear; loyalty to someone close to and always there for her; and guilt over having gotten him into the situation by asking for a ride home.

The traffic stop was in January 2015; the suppression hearing was in August 2016. Doc. 42 at 1, 7. Thompson agreed the traffic stop was a long time ago and she could not remember everything accurately. *Id.* at 107. She had been drinking that night. *Id.* at 85, 87, 89. She testified in response to a question about what had

12

happened when Sergeant Ferricane approached the car, "Well, when the police officer came up to the car, he asked—he asked [Jackson], I think, if I'm—it was so long ago, but I recall him—I think he had asked [Jackson] for his license—I'm not sure if that's—I can't remember everything he asked him. But I do remember—I can't remember everything he asked him. I think he did ask him for his license." *Id.* at 73−74. She testified in response to a question about what Jackson had said about his license having been suspended, "All I know is—I know he said something. I don't know did he say yes, it was completely suspended. I know he said something. I guess you have to show me in the paper [grand jury transcript] what I said again, because I don't—it's been too long." *Id.* at 96. She testified in response to a question about whether Sergeant Ferricane had threatened Jackson with arrest, "I don't—I don't think he—I don't think he—I don't—I don't recall him saying nothing about nobody getting arrested, if he did. Let me see … I don't think so. Man, I just can't remember, really. I really don't recall him saying that. I don't remember. … I think—I don't think he—I don't recall that. I don't remember, man. I really don't. I'm sorry, it's a lot of 'I don't remember,' but it's just that I got my—I—it just been too long ago for me, I mean …" *Id.* at 106–07. She testified in response to a question about whether any officer had drawn a gun, "Shoot. I think he might have told everybody to—he—I can't remember." *Id.* at 106.

Thompson acknowledged memory lapses but otherwise did not explain inconsistencies in her testimony. In response to questioning about Jackson's reaction to the consent request, she testified the women's aggression had made him "a little aggressive" but also testified "he was saying no, but not saying no," he "didn't say anything," and he "was kind of quiet the whole time." *Compare id.* at 78 *with id.* at 79. In response to questioning about whether Sergeant Ferricane had said what would happen without consent, she answered he had said the hard way would be to call more officers, tow the car, obtain a warrant, and then search it, but later agreed he had said the hard way would be to summon more officers and a dog. *Compare id.* at 80−81 *with id.* at 104. Reflected in a transcript excerpt above, she went back-and-

13

forth on who—Sergeant Ferricane or Jackson—had suggested more officers and whether it was in connection with obtaining consent or witnessing the search. *See id.* at 102–03. In response to questioning about whether Jackson had backed up onto University Club Boulevard (pertinent to a matter still at issue during the suppression hearing), she answered, "No. Huh-uh," but later agreed, "Right." *Compare id.* at 72 *with id.* at 92. In response to questioning about whether a car was coming toward them on University Club Boulevard (also pertinent to that matter), she answered, "It wasn't no car coming," and "I said if it was, I didn't recall no car coming at the other lane. But I don't recall no car was coming. But if there was a car coming, we wasn't even a car length of him backing up into the other lane. It wasn't like a whole bunch of cars was coming. I don't even recall a car coming. But if I said that it was a car coming, I never recall a car coming." *Id.* at 92–93. Refreshed with grand jury testimony she had seen the headlights of another car coming and she and Wright had been screaming at Jackson to get out of the lane, she testified, "We almost had no—oh, okay, my bad … Yeah." *Id.* at 94–95. She testified she had been drinking "basically beer. That's all I really had. That's all I had over there was drinking," but later testified, "But the only thing I had was beers. And I had a little bit of—they had a little liquor, but that's it," and the parties stipulated to the truth of her grand jury testimony that she had possessed marijuana that evening and had one too many beers "and a little whatever." *Compare id.* at 83–84 *with id.* at 87–88. She testified that, while at the gate to the apartment complex, she had kept pushing on a name to open the gate because she had not known or remembered the code but also testified there had been no code—just names—and the system had later changed. *Compare id.* at 90 *with id.* at 91.

Sergeant Ferricane also struggled with recall. *See id.* at 20 (inability to recall if he had run the license plates on the car), 22, 37–38 (inability to recall if Thompson and Wright had provided hard-copy identification), 30–31 (inability to recall who had informed him there was urine in the cup), 45–46 (inability to recall precisely when he had confirmed Jackson's license was suspended). But, unlike Thompson, he

14

testified without faltering or inconsistencies. *See generally id.* at 5–47. Regarding circumstances after Officer Reinert's and Reserve Officer Ritchie's arrival, their testimony corroborates his. Officer Reinert testified he had not heard Jackson complain about having been asked to consent or express he had changed his mind about the search. Doc. 42 at 54. Officer Reinert testified he could recall no passenger complaining about the search, and that is something that ordinarily would stand out to him. Doc. 42 at 54–55. Reserve Officer Ritchie answered no to questions of whether he had heard Jackson ever say he wanted no one searching his car, whether he had heard Jackson ever change his mind, whether he had heard the passengers ever say anything similar, whether he had heard any officer ever try to talk Jackson into consenting, whether he had ever thought Jackson appeared afraid or intimidated, whether he had seen any officer ever draw a weapon, whether he had heard any officer ever raise his voice, and whether he had heard any officer ever threaten to call a K-9 unit or threaten Jackson. Doc. 42 at 65–66.

I do not find inconsistent Sergeant Ferricane's testimony no one had "put up a fuss" and he had made no "threat" to summon a K-9 unit with Thompson's testimony she and Wright had been upset and had asked questions, he had explained there was an "easy way or hard way," and Jackson had wanted more officers to arrive before the search. The testimony is consistent with findings I propose (based on the testimony, Jackson's written consent acknowledging no threats, and reasonable inferences from that evidence), that Sergeant Ferricane made no threat when he asked for consent, Jackson provided consent without hesitation, Sergeant Ferricane asked if he wanted to await backup before conducting the search, he conveyed he did, and, while awaiting backup and in response to questioning by Thompson and Wright, Sergeant Ferricane explained something to the effect of there is an "easy way or hard way."

15

## Law & Analysis

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated."

Under the Fourth Amendment, "a search conducted without a warrant issued upon probable cause is per se unreasonable … subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks omitted). Voluntary consent to a search is an exception. *Id.* at 222. The United States must prove both the existence of consent and that it was voluntary. *Id.*

Consent is voluntary if "the product of an essentially free and unconstrained choice." *Id.* at 225. Consent is not voluntary if the "will [of the consenting individual] has been overborne and his capacity for self-determination critically impaired." *Id.* Consent may "not be coerced, by explicit or implicit means, by implied threat or covert force." *Id.* at 228. "For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.*

Whether consent is voluntary is a factual question determined on a case-by-case basis through careful scrutiny of the totality of the circumstances. *Id.* at 226–27. "In examining all the … circumstances … account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229. A "court must look at several factors, which include whether the defendant was free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse to consent, whether the defendant could refuse to consent, the extent of the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be

found." *United States v. Ramirez-Chilel,* 289 F.3d 744, 752 (11th Cir. 2002) (internal quotation marks and alterations omitted).

The factors are non-exhaustive, *United States v. Blake,* 888 F.2d 795, 798 (11th Cir. 1989), and no factor controls, *Schneckloth,* 412 U.S. at 227. An officer's false claim he possesses a warrant, however, alone renders consent coerced: "When a law enforcement officer claims authority to search … under a warrant, he announces in effect that the [consenting individual] has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Bumper v. North Carolina,* 391 U.S. 543, 550 (1968).

As Jackson concedes, if the Court credits Sergeant Ferricane's testimony over Thompson's, "the matter is settled." Doc. 41 at 2. Based on the proposed findings of fact, including the finding crediting Sergeant Ferricane's testimony over Thompson's testimony on Jackson's reaction to the consent request, denial of the motion to suppress is warranted. They show Jackson's consent was given without resort to threats or any other types of coercion. Any later explanation concerning the "easy way or hard way" in response to Thompson's and Wright's questioning would not vitiate the voluntariness of that consent because he had expressed no intent to withdraw it.

To avoid unnecessary briefing and decision making, I recommend declining to alternatively hold, as the United States requests, that denial of the motion to suppress is warranted if the Court credits Thompson's testimony over Sergeant Ferricane's. Even if it can be found from her testimony that Sergeant Ferricane made an "easy way or hard way" statement before Jackson's consent to obtain his consent, the parties have provided insufficient briefing to make the alternative holding. The United States cites and Jackson distinguishes unpublished district and appellate court cases from other circuits for the general proposition that the "easy way or hard way" tactic is not per se coercive but do not comprehensively analyze whether the

tactic is per se coercive if the "hard way" involves an officer's statement he will obtain a warrant or call a drug dog when he has no apparent ability or intention to do so.[6]

---

[6]The United States presented no evidence or argument that Sergeant Ferricane could have summoned a K-9 unit, obtained a warrant to search the car, or lawfully conducted a warrantless search of the car under the search-incident-to-arrest exception, see *Arizona v. Gant*, 556 U.S. 332, 343 (2009), the inventory-search exception, see *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976), the automobile exception, see *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006), or any other exception.

The Eleventh Circuit has summarily expressed that an officer's statement that he will obtain a search warrant does not establish coercion, but, in those cases, the Eleventh Circuit did not analyze whether the same holds true if the officer had no basis for obtaining a warrant or made the statement as pretext for coercion. See *United States v. Aguilar*, 519 F. App'x 541, 545–46 (11th Cir. 2013); *United States v. Racca*, 255 F. App'x 367, 369 (11th Cir. 2007); *United States v. Baker*, 206 F. App'x 928, 930 (11th Cir. 2006). In accord with holdings of other circuits, the Eleventh and former Fifth Circuits have suggested a statement concerning a search warrant that is baseless or based on a misrepresentation, or a threat to summon K-9 unit, could render consent involuntary. See *United States v. Savage*, 459 F.2d 60, 61 (5th Cir. 1972) (consent was not rendered involuntary by an officer's "'Yes, we probably can'" response to whether the officer could get warrant because it had not been a factual misrepresentation and it had been made in response to an inquiry); *United States v. Boukater*, 409 F.2d 537, 538 (5th Cir. 1969) (observing the court might find consent involuntary if the defendant had not been free to leave and the officer had either said or implied the defendant might as well consent because a warrant could be quickly obtained if he did not); *United States v. Rendon*, 462 F. App'x 923, 924–26 (11th Cir. 2012) (accepting a magistrate judge's determination and the government's concession that a driver's consent was involuntary where the driver initially refused to give consent, an officer responded he had a right to refuse but the officer would just call for a drug dog, and the driver thereupon consented).

18

**Recommendation**[7]

I recommend denying the motion to suppress, Doc. 28, as supplemented, Doc. 41.

**Entered** in Jacksonville, Florida, on November 16, 2016.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:  The Honorable Marcia Morales Howard, United States District Judge
    Michael Coolican, Assistant United States Attorney
    Mark Rosenblum, Assistant Federal Defender

---

[7]"Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], … a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.